*DLXIX
 

 OPINION AND ORDER
 

 STEIN, District Judge.
 

 This action arises from a sharp fall in the price of QLT Inc. common stock on December 14, 2000, after QLT, a Vancouver-based pharmaceutical manufacturer whose common stock is listed on the NASDAQ and Toronto stock exchanges, issued a financial update stating that the fourth quarter 2000 sales of its main product, Visudyne, were expected to be lower than previously forecast. This announcement triggered a drastic reaction by the investing public, as the price of QLT shares fell from approximately $40.44 per share at the close of December 13 to a low of $28.06 per share on December 14.
 
 [1]
 

 Plaintiffs, the class of purchasers of QLT stock between August 1, 2000 and December 14, 2000, brought these actions pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the “Exchange Act”), 15 U.S.C. § 78j(b), Section 20 of the Exchange Act, 15 U.S.C. § 78t(a), and Rule 10b-5 of Securities and Exchange Commission, 17 CFR § 240.10b-5. The Consolidated Class Action Complaint (“the Complaint”) alleges that QLT and its Chief Executive Officer and Chief Financial Officer-individual defendants Dr. Julia Levy and Kenneth Galbraith, respectively-is
 
 *DLXX
 
 sued false and misleading information to the public concerning sales projections for Visudyne. Plaintiffs seek compensatory damages for the losses they incurred due to their purchases of QLT shares during the class period, interest, and attorneys’ fees.
 

 Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief may be granted. For the reasons set forth below, that motion is granted.
 

 BACKGROUND
 

 Visudyne treats symptoms of age-related macular degeneration (“AMD”), a disease of the eye that typically afflicts people over age 65.
 
 [2]
 
 (Complaint at ¶ 29). There are two types of AMD, “wet” and “dry.” Wet AMD results from leakage of abnormal blood vessels under the macula-the central part of the retina-and can cause vision loss and sometimes blindness. (Complaint at ¶ 30). Wet AMD can be further classified according to the location of the abnormal blood vessels into subfo-veal, juxtafoveal, and extrafoveal CNV forms or according to the pattern of leakage into “occult” or “classic” forms.
 
 Id.
 
 Visudyne was approved to treat the “predominantly classic subfoveal CNV form of AMD” by the Food and Drug Administration (“FDA”) on April 12, 2000. (Complaint at ¶ 32). Visudyne treatment involves “infusion by doctor of Visudyne, a light-activated drug, followed by the use of a non-thermal laser,” which “activates and temporarily closes the leaking blood vessels.” (Complaint at ¶ 31).
 

 A. Alleged Misrepresentations of the Size of the Market for Visudyne
 

 Plaintiffs allege that defendants had exaggerated the potential market for Visu-dyne treatment. In an April 12, 2000 press release, QLT described the potential market for Visudyne as follows:
 

 Specifically, the FDA approved Visu-dyne therapy for the treatment of AMD in patients with predominantly classic subfoveal choroidal neovascularization (CNV). Medical experts estimate that of the 500,000 new patients that develop wet AMD every year around the world, 40-60% will develop predominantly classic lesions during the progression of their disease. Patients with this condition lose their ability to read, drive and recognize faces in as little as two months to three months.
 

 As the first approved drug therapy for this devastating condition, Visudyne provides new hope to many of the 200,000 Americans who lose their vision from wet AMD every year.
 

 (Attached to Chlapowski Declaration at Exhibit 6)
 

 According to plaintiffs, the 40-60% figure in the press release greatly exaggerates the prevalence of the forms of AMD suitable for Visudyne treatment. (Complaint at ¶ 36). The actual percentage, plaintiffs claim, is “far less than [QLT] represented.”
 
 Id.
 
 For example, a survey of retinal specialists conducted by a Merrill Lynch research analyst reported that only 17% to 20% of “patients with wet AMD fit the FDA’s criteria for Visudyne treatment,” and a similar survey contained in a research report by analysts at Leerink Swann & Co. indicated “doctors expected up to 17% of their patients with wet AMD to be eligible to use Visudyne.”
 
 Id.
 
 Plain
 
 *DLXXI
 
 tiffs also cite a statement of Dr. Dan Montzka, a retinologist, that only 2% of patients with wet AMD “would benefit from treatment [with Visudyne].”
 
 Id.
 
 Finally, a February 9, 2001 article in the National Post (Canada) reported that “[a]bout 200,000 people in North America suffer from wet AMD. Scientists working for QLT believe that 40,000 of these patients have the classic form and can be treated with Visudyne. Adding occult sufferers could make Visudyne available to another 80,000 patients.” Plaintiffs allege that defendants knew that the press release had exaggerated the market for Vi-sudyne prescriptions or that they acted recklessly in disregarding this fact. Plaintiffs further allege that, in light of the exaggeration of the market for Visudyne, defendants knew that the initial forecasts for Visudyne sales in the fourth quarter of 2000 were false and misleading or that they recklessly disregarded this fact.
 

 In August and early September of 2000, individual defendants Levy and Galbraith sold large blocks of their QLT shares. Specifically, the Complaint alleges that beginning in early August 2000, Galbraith sold 115,800 QLT shares-approximately 85% of his holdings at the time-for 13.67 million Canadian dollars (“CN$”). Similarly, in early September 2000, Levy sold 42,000 QLT shares for CN$ 4.65 million. (Complaint at ¶ 53-a, 53-b, 72).
 

 B. Alleged Misrepresentations of Fourth Quarter 2000 Visudyne Sales Forecasts
 

 Plaintiffs’ allegation also focus on the discrepancy between the expectations allegedly created by a series of statements by QLT and the individual defendants in October of 2000-including initial fourth quarter 2000 Visudyne sales forecasts-on one hand, and the revised sales forecast released by QLT on December 14, 2000, on the other. According to the Complaint, Galbraith was quoted in a Dow Jones News article on October 17, 2000 that “QLT Inc. sees 30-50% growth in Visu-dyne sales for the fourth quarter over the third quarter (of 2000).” (Complaint at ¶ 57-b). Galbraith also expected, according to an October 18, 2000 article in the
 
 Globe and Mail,
 
 the sales of Visudyne to be “between $40-million and $50-million” for the fourth quarter of 2000.
 
 [3]
 
 (Complaint at ¶ 60). In addition, defendant Levy allegedly told research analysts during a teleconference: “we just want the $40-50 [million] in sales of Visudyne [in fourth quarter 2000]. We’re comfortable with the 35% quarter-over-quarter growth [from third quarter 2000].” (Complaint at ¶ 57 — d).
 

 The Complaint also identifies a number of other allegedly fraudulent statements regarding Visudyne sales. During a conference call with financial analysts on August 1, 2000, Galbraith stated that there was growing demand for Visudyne and that “I don’t think [the second quarter 2000] is going to be a one-quarter blip.” (Complaint at ¶ 50). In an October 11, 2000 press release, QLT included quotes by Levy that Visudyne received “strong endorsement by retinal specialists” and that “we are confident in CIBA Vision’s (QLT’s marketing partner) ability to continue strong growth in sales in the U.S. and rapidly introduce Visudyne in Europe and other markets.... ” (Complaint at ¶ 54). Galbraith echoed those sentiments in a QLT press release accompanying its third quarter 2000 financial results. (Complaint at ¶ 57-a). Galbraith also stat
 
 *DLXXII
 
 ed during a CNN interview that “the uptick for [Visudyne] looks excellent” and that “[Visudyne would] do about 100 million (U.S. dollars in sales) this year and hopefully grow that to 6 or 700 by 2003. So pretty good growth rates.” (Complaint at ¶ 57-d).
 

 QLT revised those forecasts in its December 14, 2000 press release and stated that “fourth quarter demand for Visudyne vials is expected to grow 20 to 25% over Q3[,] which will translate into sales of approximately U.S. $36-38 million,” down from the earlier forecast of $40-50 million sales and 35% growth. (Complaint at ¶ 65; Press Release dated December 14, 2000, attached to Chlapowski Declaration at Exhibit 10). The press release attributed the slower than expected growth to “lack of reimbursements in some countries in Europe and in the U.S. as well as a reduction in revenue caused by the [currency fluctuation].” As noted above, although on December 13, 2000, QLT shares had closed at approximately $40.44 on the NASDAQ, they reached a low of $28.06 on December 14.
 
 [4]
 
 (Complaint at ¶ 4, ¶ 67).
 

 C. Alleged Misrepresentations Regarding HCFA Reimbursement Approval
 

 Approval by the Health Care Financing Administration (“HCFA”) or by local Medicare Carrier Medical Directors is required before physicians are permitted to receive Medicare reimbursement for Visu-dyne treatment. In June 2000, the HCFA assigned a temporary billing code for Visu-dyne treatment, known as photodynamic treatment or “PDT,” as an unlisted procedure. (Complaint at ¶ 42). Furthermore, when approval for Visudyne was pending before the U.S. Pharmacopoeia, Visudyne was reimbursed as a supply by Medicare, instead of as a drug, until July 18, 2000. (Complaint at ¶ 43-44). After engaging in extensive discussions with the HCFA, QLT resolved the reimbursement issues on November 8, 2000 when the HCFA released a national coverage policy for PDT and Visudyne reimbursements, which was to take effect on July 1, 2001. (Complaint at ¶ 46-47).
 

 During this period, Levy discussed the issue of reimbursements during a conference call with financial analysts. She noted the process of seeking HCFA approval and stated that “[QLT] made progress in Texas, Florida, Ohio-the payment procedures are much clearer. Some of the hiccups that was there in July and August ha[ve] gone away.” (Complaint at ¶ 57-e). On November 2 and 10, 2000, QLT publicized the HCFA approval of Visudyne but did not discuss the implications of not having received HCFA approval sooner. (Complaint at ¶ 63-64).
 

 Plaintiffs claim that defendants “knew that Visudyne’s market potential was held back by the delay in formulating reimbursement criteria by HCFA,” which made physicians “reluctant to invest in the lasers required to perform the procedure until these reimbursement issues were resolved.” (Complaint at ¶ 52-a, 52 — b). Plaintiffs further allege that defendants “failed to disclose the true impact that the delay between April 2000 and November 2000 [of Medicare reimbursements] had on the demand for Visudyne” during and after they provided the initial forecasts for
 
 *DLXXIII
 
 fourth quarter 2000 sales for Visudyne. (Complaint at ¶ 65).
 

 Defendants offer four sets of reasons in support of their motion to dismiss. First, they argue that misrepresentations identified in the Complaint are either immaterial or otherwise protected by the statutory safe harbor of the Private Securities Litigation Reform Act of 1995 or the judicial “bespeaks caution” doctrine. Second, defendants assert that the Complaint fails to plead the falsity of QLT’s initial forecasts for Visudyne sales in fourth quarter 2000 with requisite particularity. Third, they argue that the Complaint fails to plead sufficient facts to support an inference of scienter; i.e., that defendants knew or recklessly disregarded the falsity of their public statements. Finally, defendants assert that the Complaint does not support a finding of loss causation between the alleged misrepresentation of the size of the market for Visudyne treatment and the damages suffered by the plaintiffs due to the fall in the share price of QLT on December 14, 2000.
 

 DISCUSSION
 

 A. Standard of Review
 

 In evaluating a Fed.R.Civ.P. 12(b)(6) motion to dismiss, this Court looks to facts contained in the pleadings, including documents referenced in the Complaint “as well as public disclosure documents required to be, and that have been, filed with the SEC.”
 
 Rothman v. Gregor,
 
 220 F.3d 81, 88 (2d Cir.2000); see also
 
 Cortec Indus., Inc. v. Sum Holding, L.P.,
 
 949 F.2d 42, 47 (2d Cir.1991);
 
 Cameron v. Church,
 
 253 F.Supp.2d 611, 618 (S.D.N.Y.2003). The facts alleged in the Complaint are presumed to be true and all reasonable inferences are drawn in the plaintiffs’ favor. See
 
 Lee v. Bankers Trust Co.,
 
 166 F.3d 540, 543 (2d Cir.1999). Plaintiffs’ claims may be dismissed only if “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Drake v. Delta Air Lines, Inc.,
 
 147 F.3d 169, 171 (2d Cir.1998) (quoting
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).
 

 B. Elements of a Section 10(b) Claim and Its Heightened Pleading Requirements
 

 A claim pursuant to section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which forbids the use of a “manipulative or deceptive device or contrivance” in connection with the purchase or sale of securities, is subject to the pleading requirements of the Private Securities Litigation Reform Act of 1995 (the “PSLRA”), 15 U.S.C. § 78u-4, as well as the heightened pleading requirements for fraud contained in Rule 9(b) of the Federal Rules of Civil Procedure. See
 
 Rombach v. Chang,
 
 355 F.3d 164, 170 (2d Cir.2004). The PSLRA requires a complaint to specify “each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,” 15 U.S.C. § 78u-4(b)(1), and to state “with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.” 15 U.S.C. § 78u-4(b)(2); see also
 
 In re Globalstar Securities Litigation,
 
 01 Civ. 1748, 2003 WL 22953163 at *4, 2003 U.S. Dist. LEXIS 22496 at *12-13, (S.D.N.Y. Dec. 15, 2003).
 

 To satisfy the pleading requirements of Rule 9(b), moreover, a complaint asserting a section 10(b) claim must identify four elements: (1) the statements deemed fraudulent, (2) the speaker, (3) the time and circumstances of the allegedly fraudulent statements, and (4) the reasons as to why the statements are fraudulent. See
 
 Globalstar,
 
 2003 WL 22953163 at *4, 2003 U.S. Dist. LEXIS 22496 at *13;
 
 Rombach,
 
 355 F.3d at 172 (“[t]o meet the pleading
 
 *DLXXIV
 
 standard of Rule 9(b), this Court has repeatedly required, among other things, that the pleading ‘explain why the statements were fraudulent.’ ” (internal citations omitted)). Accordingly, to state adequately a claim for relief for violation of section 10(b) and Rule 10b-5, a complaint must plead that “the defendant^] made a false statement or omitted a material fact, with scienter, and that plaintiffs reliance on defendants’ action caused plaintiff injury.”
 
 Kalnit v. Eichler,
 
 264 F.3d 131, 138 (2d Cir.2001) (quoting
 
 San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co.,
 
 75 F.3d 801, 808 (2d Cir.1996)); see also
 
 Lawrence v. Cohn,
 
 325 F.3d 141, 147 (2d Cir.2003) (same).
 

 C. Application of PSLRA “Safe Harbor” and the “Bespeaks Caution” Doctrine
 

 At the outset, defendants urge that none of the alleged misrepresentations identified in the Complaint are actionable under the federal securities laws because they fall within the “safe harbor” provisions of the PSLRA, 15 U.S.C. § 78u-5(c), or are protected by the judicial “bespeaks caution” doctrine.
 

 The PSLRA creates two categories of statutory “safe harbors.” First, there is no fraud liability under federal securities laws for making a forward-looking statement if such a statement is either (i) identified as forward-looking “and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the statement;” or “(ii) immaterial.” 15 U.S.C. § 78u-5(c)(l)(A). Secondly, the statutory “safe harbor” also insulates from fraud liability the making of a forward-looking statement unless a plaintiff can prove that such a statement was “made with actual knowledge by that person that the statement was false or misleading.” 15 U.S.C. § 78u-5(c)(1)(B)(i); see also
 
 In re Independent Energy Holdings PLC Securities Litigation,
 
 154 F.Supp.2d 741, 755 (S.D.N.Y.2001) (applying 15 U.S.C. § 77z-2(c), the parallel “safe harbor” provision applicable to the Securities Act of 1933, 15 U.S.C. § 77a
 
 et
 
 seq).
 

 The judicial “bespeaks caution” doctrine operates in a similar fashion and protects forward-looking statements accompanied by adequate cautionary language from being actionable. Specifically, under the “bespeaks caution” doctrine, “ ‘alleged misrepresentations ... are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language ... ’”
 
 Rombach,
 
 355 F.3d at 173 (quoting
 
 Halperin v. eBanker USA.com, Inc.,
 
 295 F.3d 352, 357 (2d Cir.2002)). Because statements identified in the Complaint regarding the size of the existing market for Visudyne and QLT’s progress in seeking HCFA approval concern existing facts and are therefore not “forward-looking,” such statements are subject to neither the statutory “safe harbor” nor the “bespeaks caution” doctrine.
 
 [5]
 

 The PSLRA deems generalized expressions of corporate optimism immaterial as a matter of law and therefore insufficient as the basis for an action alleging securities fraud. See
 
 Rombach,
 
 355 F.3d at 174 (“[u]p to a point, companies must be
 
 *DLXXV
 
 permitted to operate with a hopeful outlook: ‘people in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident of their stewardship and the prospects of the business that they manage.’ ”) (internal citations omitted);
 
 Lasker v. New York State Elec. & Gas Corp.,
 
 85 F.3d 55, 58 (2d Cir.1996). This “safe harbor” applies to many of the statements identified in the Complaint. For example, Galbraith’s August 1, 2000 statement that QLT’s results from the second quarter of 2000 “is [not] going to be a one-quarter blip” and Levy’s expression of confidence on October 11, 2000 in “CIBA Vision’s ability to continue strong growth in sales in the U.S.” are clearly expressions of the corporate stewards’ optimistic opinions.
 
 [6]
 
 Accordingly, pursuant to 15 U.S.C. § 78u—5(c)(1)(A)(ii), such statements are immaterial as a matter of law and constitute an insufficient basis on which to support a claim of securities fraud.
 

 In contrast, when Levy allegedly told research analysts that “[QLT was] comfortable with the 35% quarter-over-quarter growth (in Visudyne sales),” this was not merely a generic statement of optimism but a concrete projection of future performance. This and similar specific projections regarding the rate of growth in Visudyne sales or regarding QLT’s revenue in fourth quarter 2000 also do not fall within the purview of the “immateriality” safe harbor and may provide the basis for a section 10(b) action. See
 
 In re Int’l Bus. Machs. Corporate Securities Litigation,
 
 163 F.3d 102, 107 (2d Cir.1998) (“[statements regarding projection of future performance may be actionable under section 10(b) or Rule 10b-5 if they ... are supported by specific statements of fact”);
 
 Globalstar,
 
 2003 WL 22953163 at *9, 2003 U.S. Dist. LEXIS 22496 at *26-27.
 

 Defendants further contend that even if defendants made certain material “forward-looking” statements, they are nonetheless entitled to the statutory safe harbor and protection of the “bespeaks caution” doctrine because such statements were accompanied by meaningful cautionary language. To illustrate this point, defendants offer the “Risk Factors” section of QLT’s 1999 10-K filed with the SEC, the risk disclosure that prefaced Galbraith’s August 1, 2000 conference call with research analysts, and the cautionary disclaimer included in QLT’s August 1, October 11, and October 17, 2000 press releases.
 

 Because the forward-looking statements in the aforementioned press releases are immaterial, there is no need to ascertain the adequacy of the cautionary language attached to them. More importantly, however, defendants do not aver whether meaningful cautionary language had been included when Levy’s allegedly made the statement “we’re comfortable with the 35% quarter-over-quarter growth” during a research analyst teleconference. This Court cannot infer, on the basis of the other instances of cautionary language QLT included, that such language had been provided in conjunction with Levy’s statement or that it was in fact meaningful and adequate. Accordingly, neither the statutory safe harbor nor the “bespeaks caution”
 
 *DLXXVI
 
 doctrine applies to this and similar specific sales projections.
 

 D. False Statements Made with Scienter
 

 The Complaint recites the alleged misrepresentations and identifies the source and party or entity making those statements; accordingly, it satisfies the first three prongs of the Rule 9(b) pleading requirements set forth above. See
 
 Globalstar,
 
 2003 WL 22953163 at *5, 2003 U.S. Dist. LEXIS 22496 at *14. As to the fourth requirement-the reasons why the statements were fraudulent>-the plaintiffs must “state with particularity the specific facts in support of [their] belief that [such] statements were false when made.” Bombach, 355 F.3d at 172; see also
 
 Globalstar,
 
 2003 WL 22953163 at *5, 2003 U.S. Dist. LEXIS 22496 at *14-15 (“plaintiffs must plead both that defendants made false statements and that they did so with the requisite scienter”) (internal citations omitted). In this case, the Complaint identifies two distinct categories of misrepresentations: exaggeration of existing facts concerning potential market size and intentionally inflated forward-looking sales forecasts (including HCFA reimbursement issues).
 
 [7]
 
 We will first set forth the standards for pleading falsity and scienter in each context and then analyze those two categories of misrepresentations in that sequence.
 

 With respect to defendants’ exaggeration of market potential for Visudyne, the Complaint alleges that defendants knew information that was contrary to the alleged misrepresentations; therefore, “the falsity and scienter [pleading] requirements are essentially combined.”
 
 In re Revlon Inc. Securities Litigation,
 
 2001 WL 293820 at *7 (S.D.N.Y., Mar. 27 2001) (citing
 
 Rothman,
 
 220 F.3d at 89-90). That is, “if [the Complaint has] sufficiently pled facts to support scienter, [it has] also met the pleading requirements for falsity.”
 
 Id.
 

 Scienter may be established in one of two ways: (1) “by alleging facts to show that defendants had both motive and opportunity to commit fraud,” or (2) “by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness.”
 
 Globalstar,
 
 2003 WL 22953163 at *5, 2003 U.S. Dist. LEXIS 22496 at *15 (quoting
 
 Novak,
 
 216 F.3d at 307). As the United States Court of Appeals for the Second Circuit explained in Novak, motive denotes concrete benefits that misrepresentations could create and opportunity entails “the means and the likely prospect of achieving concrete benefits by the means alleged.” 216 F.3d at 307 (quoting
 
 Shields v. Citytrust Bancorp, Inc., 25
 
 F.3d 1124, 1130 (2d Cir.1994)). Reckless conduct, while “harder to identify with ... precision and consistency,” can involve “an egregious refusal to see the obvious, or to investigate the doubtful.”
 
 Id.
 
 at 308 (quoting
 
 Chill v. General Electric Co.,
 
 101 F.3d 263, 269 (2d Cir.1996)).
 

 The allegedly inflated sales forecasts present a slightly different issue and require an examination into both the adequacy of pleading for falsity and for scienter. Sales forecasts are forward-looking statements instead of statements of existing facts. The plaintiffs cannot simply prove the falsity of those forecasts by stating that they ultimately proved erroneous-this would be the essence of a “fraud by hindsight” claim that courts in consistently reject. See
 
 Stevelman v. Alias Research Inc.,
 
 174 F.3d 79, 85 (2d Cir.1999);
 
 Shields,
 
 25 F.3d at 1129. Instead, the
 
 *DLXXVII
 
 plaintiffs must plead specific facts to support a finding that, in view of information possessed by the defendants in October 2000 when they made the initial forecasts, such sales forecasts were clearly inflated.
 

 1. The Market for Visudyne Treatment
 

 Defendants contend that the description of the market for Visudyne treatment in QLT’s April 12, 2000 press release is factually correct. The contrary evidence cited in the Complaint, such as lower percentages of eligible patients discussed in research reports, use different definitions of eligibility or suitability and, defendants contend, do not actually prove the falsity of the percentage cited in the press release. A correct statement of fact is not a misrepresentation and cannot, therefore, support a cause of action for securities fraud. The accuracy of the percentage contained in the press release is clearly a question of fact. This Court cannot dismiss the Complaint on this basis because the truth of plaintiffs’ factual allegations is assumed at this stage of litigation. See
 
 Bernheim v. Litt,
 
 79 F.3d 318, 321 (2d Cir.1996) (when evaluating a 12(b)(6) motion, the “issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims”) (internal quotation marks and citations omitted).
 

 The pleading requirement of scienter is satisfied here because defendants Levy and Galbraith sold significant amounts of QLT shares in August and September 2000, shortly after publication of the alleged exaggeration of the market for Visu-dyne treatment. The trades completed by the individual defendants provided them with concrete benefits; and, as senior QLT corporate officers, they were in position to control the information released to the investing public. Accordingly, the “motive and opportunity” prong of the pleading requirements for scienter is met. See
 
 In re Scholastic Corp. Securities Litigation,
 
 252 F.3d 63, 74-75 (2d Cir.2001) (finding “motive and opportunity” where a corporate officer realized gains from stock sales while withholding information on declining trend of sales);
 
 Novak,
 
 216 F.3d at 318 (holding that insider sales of stock is a classic instance of “motive and opportunity”).
 

 2. Fourth Quarter 2000 Visudyne Sales Forecasts
 

 Plaintiffs have not sufficiently pled that the fourth quarter 2000 Visudyne sales forecasts were false when made. Plaintiffs allege that the optimistic forecasts were clearly false when made in light of two types of information regarding Vi-sudyne known by defendants: delays in Medicare reimbursement approval for Vi-sudyne treatment and a limited demand due to a smaller than publicized market. However, the plaintiffs state this conjecture as an indisputable conclusion
 
 [8]
 
 but fail to articulate how possession of such information made it clear to defendants that their initial sales forecasts were erroneous. Without identifying any concrete mechanism through which possession of such information reveals the misleading nature of the sales forecasts in October 2000,
 
 [9]
 
 a bald
 
 *DLXXVIII
 
 assertion of falsity of the initial sales forecasts is deficient. See
 
 San Leandro,
 
 75 F.3d 801, 812-813 (2d Cir.1996) (“unsupported general claims of the existence of confidential company sales reports [revealing larger decline in sales] is insufficient to survive a motion to dismiss”);
 
 In re IBM,
 
 163 F.3d at 109 (dismissing fraud claim based on forward-looking statement for lack of evidence
 
 of
 
 its falsity);
 
 compare In re Scholastic Corp.,
 
 252 F.3d at 70-74 (holding that securities fraud claim against publisher for failure to disclose declining revenue trends had been sufficiently pled because plaintiffs identified link between defendant’s knowledge of specific facts on a higher rate of book returns and lower sales);
 
 Globalstar,
 
 2003 WL 22953163 at *5, 2003 U.S. Dist. LEXIS 22496 at *15 (denying motion to dismiss because plaintiffs specifically identified facts contradicting premises of earnings forecast based on statements of “an ex-Globalstar senior business development manager”).
 

 Plaintiffs also fail to plead sufficiently that the initial fourth quarter sales forecasts had been made with scienter. As discussed above, plaintiffs’ chief evidence of scienter was Levy and Galbraith’s sales of QLT shares in August and September of 2000. (Complaint at ¶ 72). Because the allegedly overoptimistic fourth quarter Vi-sudyne sales forecasts were made in October 2000-after Levy and Galbraith had completed their stock trades-those trades do not bear on defendants’ scienter at the time they made the forecasts. As there is was no credible allegation of circumstantial evidence of knowledge or reckless behavior, this Court need not engage in an analysis of the second prong of the test for scienter.
 

 E. Loss Causation
 

 Finally, in addition to requirements for falsity and scienter, the Complaint must also plead sufficient facts to establish transaction and loss causation in order to survive a motion to dismiss. See
 
 In re Initial Public Offering Securities Litigation,
 
 297 F.Supp.2d 668, 669-670 (S.D.N.Y.2003). The Complaint pleads that transaction causation, also known as reliance, should be presumed under the theory of “fraud on the market.” (Complaint at ¶ 73-74) Pursuant to the PSLRA, plaintiffs “have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss which the plaintiff seeks to recover damages.” 15 U.S.C. § 78u-4(b)(4). Here, the plaintiffs must plead the element of loss causation, which links damages they suffered to the alleged exaggeration of the market for Visudyne. They cannot do so.
 

 The Second Circuit has analogized the concept of loss causation in securities actions to the notion of proximate cause in torts “because, similar to proximate cause, in order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation.”
 
 Citibank, N.A. v. K-H Corp.,
 
 968 F.2d 1489, 1495 (2d Cir.1992). Thus, if an intervening cause supercedes the effects of an initial misrepresentation, then a Section 10(b) claim fails. See
 
 Suez Equity Investors, L.P. v. Toronto-Dominion Bank,
 
 250 F.3d 87, 96 (2d Cir.2001) (citing
 
 Bastian v. Petren Res. Corp.,
 
 892 F.2d 680, 685 (7th Cir.1990)).
 

 In this case, plaintiffs seek compensatory damages for losses due to the fall in price of QLT shares on December 14, 2000. The Complaint alleges that the fall was caused by the disclosure of the shortfall in fourth quarter 2000 Visudyne sales forecast. It contains no allegation that the alleged exaggeration of the market for Vi-sudyne treatment directly caused the sharp fall in the price of QLT shares. Insofar as the Complaint alleges the short
 
 *DLXXIX
 
 fall in sales forecast was related to the alleged exaggeration of the Visudyne market, such arguments have already been rejected in part II.D.2
 
 supra.
 

 Therefore, the revised fourth quarter sales forecast released on December 14, 2000 was clearly an intervening cause that superceded any direct effect of the alleged exaggeration contained in the April 12, 2000 press release regarding the size of the market for Visudyne treatment. Accordingly, loss causation linking the damages sought by plaintiffs and the alleged exaggeration of market size cannot be shown on the pleadings.
 

 CONCLUSION
 

 For the reasons set forth above, defendants’ motion to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted is granted. Furthermore, even a liberal reading of the Complaint does not indicate that a valid claim for securities fraud may be alleged in conformity with the pleading requirements of Rule 9(b) and the PSLRA. Accordingly, the Consolidated Class Action Complaint is hereby dismissed with prejudice. See
 
 Van Buskirk v. New York Times Co.,
 
 325 F.3d 87, 91-92 (2d Cir.2003);
 
 Branum v. Clark,
 
 927 F.2d 698, 705 (2d Cir.1991).
 

 SO ORDERED.
 

 [1]
 

 . Except as otherwise noted, $ denotes U.S. dollars, not Canadian dollars.
 

 [2]
 

 . Except as otherwise noted, the facts cited in this opinion are undisputed. At this stage of litigation, all the factual allegations in the complaint are accepted as true and all inferences are construed in plaintiffs' favor. See, part II.A,
 
 infra.
 

 [3]
 

 . The Complaint did not attach the article or specify whether this figure was denominated in Canadian or U.S. dollars. Construing the complaint most favorably for plaintiffs, it is assumed to refer to U.S. dollars.
 

 [4]
 

 . There is a discrepancy between paragraph 4 and paragraph 67 of the Complaint with regard to the low point of QLT share price on December 14, 2000. Paragraph 4 states that it reached a low of $28.06 while paragraph 67 marks it as $24. Because both paragraphs describe the drop as 31% from a high of $44.44, this Court assumes the $28.06 figure is correct because it is closer to 69% of $44.44. In either event, the difference between $28.06 and $24 does not alter this
 
 Court's
 
 legal
 
 conclusions.
 

 [5]
 

 . Defendants also contend that there was no material omission because QLT bore no duty to disclose any alleged problems with obtaining Medicare reimbursement for Visudyne treatment. The Complaint did not specifically allege material omission, but framed the "reimbursement issue” as a premise for its allegation of defendants' knowledge of falsity of their initial forecasts for fourth quarter 2000 sales figures. (Complaint at ¶ 65) Accordingly, this issue will be addressed in the context of discussion of "falsity” in section II.D
 
 infra.
 

 [6]
 

 . Plaintiffs take the position that Levy’s statement should be viewed as a statement of a present fact because it is phrased in the present tense. However, this Court views her phrase "to continue strong growth in sales" as pertaining to future events. Because Visu-dyne sales grew
 
 22%
 
 in the third quarter of 2000, Levy's characterization of such growth as "strong” is not a clear misstatement.
 

 [7]
 

 . In light of this Court’s earlier conclusion that defendants' public statements other than the fourth quarter sales forecasts were immaterial, we are only concerned with the forecasts in this section.
 

 [8]
 

 . For example, after describing fourth quarter forecasts made by defendants Levy and Galbraith, the Complaint simply states "statements in the foregoing press releases, news report, and conference call were materially false or misleading because defendants knew or recklessly regarded the facts set forth in paragraphs 29 through 47, above.” (Complaint at ¶ 59).
 

 [9]
 

 . This can be, for example, QLT’s formula for predicting sales based on demand and rate of reimbursement, among other factors, which would enable a trier of fact to determine the accuracy of the initial sales forecasts.