### In re ATLAS AIR WORLDWIDE HOLDINGS, INC. SECURITIES LITIGATION.

### No. 02 Civ. 8334(WCC).

United States District Court,
S.D. New York.

July 7, 2004.

---

Bernstein, Liebhard & Lifshitz, LLP, Joseph R. Seidman, Jr., Of Counsel, New York, Plaintiffs' Liaison Counsel.

Schiffrin & Barroway, LLP, Andrew L. Barroway, Marc Willner, Of Counsel, Bala Cynwyd, PA, Plaintiffs' Lead Counsel.

Milberg, Weiss, Bershad, Hynes & Lerach, Lee A. Weiss, Kristi M. Stahnke, New York, Plaintiffs' Counsel.

Cahill, Gordon & Reindel LLP, Charles A. Gilman, Scott L. Walker, Of Counsel, New York, Attorneys for Defendant Atlas Air Worldwide Holdings, Inc.

Shearman & Sterling LLP, Kenneth M. Kramer, Brian H. Polovoy, Of Counsel, New York, Attorneys for Defendant Morgan Stanley & Co. Incorporated (sued as Morgan Stanley Dean Witter).

Morrison & Foerster, LLP, Carl H. Loewenson, Jr., Anthony M. Radice, Mark David McPherson, Of Counsel, New York, Attorneys for Defendant Richard H. Shuyler.

Perkins Coie LLP, Donald Salcito, Sean C. Stewart, Of Counsel, Denver, CO, Attorneys for Defendant Stuart G. Weinroth.

Piper Rudnick, David E. Nachman, Kirsten M. Nelson, Of Counsel, New York, Stephen E. Kaufman, P.C., Stephen E. Kaufman, Of Counsel, New York, for Defendant Brian H. Rowe.

Arkin Kaplan LLP, Michelle A. Rice, Paul R. Niehaus, Of Counsel, New York, Smith, Gambrell & Russell, LLP, John G. Despriet, James E. Connelly, William Parker Sanders, Of Counsel, Atlanta, GA, for Defendant Stanley J. Gadek.

Stillman & Friedman, P.C., John B. Harris, Karin Klapper, Of Counsel, New York, Attorneys for Defendants Douglas A. Carty and James T. Matheny.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Lead plaintiff Messner & Smith ("lead plaintiff") and plaintiff John Mahoney (collectively "plaintiffs") brought this action against defendants Richard Shuyler, Brian Rowe, Douglas Carty, Stanley Gadek, James Matheny and Stuart Weinroth (collectively "the individual defendants"), and Morgan Stanley & Co., Inc. ("Morgan Stanley") alleging claims under the Securities Act of 1933 (the "Securities Act") and the Securities and Exchange Act of 1934 (the "Exchange Act").[1] Defendants move to dismiss pursuant to section 21D(b)(3)(B) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. Morgan Stanley also moves pursuant to FED. R. CIV. P. 12(f) to strike Mahoney's class action allegations. For the reasons stated herein, Morgan Stanley's and Shuyler, Carty, Gadek and Weinroth's motions to dismiss are denied in their entirety. Morgan Stanley's motion to strike is also denied. Rowe and Matheny's motions to dismiss are granted in part and denied in part.

## BACKGROUND

### I. Introduction

Plaintiffs commenced this action on behalf of: (1) all those who purchased or otherwise acquired Atlas Air common stock between April 18, 2000 and October 15, 2002; and (2) all those who purchased or otherwise acquired Atlas Air common stock traceable to a Prospectus Supplement (the "September Prospectus Supplement") utilized in a September 2000 secondary public offering (the "September Secondary Offering"). The Registration Statement pertaining to the September Secondary Offering incorporated the September Prospectus Supplement. (Complt. ¶ 1.)[2] The following allegations appear in the Complaint.[3]

Atlas Air was founded by Michael A. Chowdry in 1992 and went public in 1995. (Id. ¶ 29.) Atlas assembled a fleet of Boeing 747–400 and 747–200 cargo planes and became a leader in the outsourced heavy cargo market. (Id. ¶¶ 29–30.) The company leased its aircraft to various international airlines and provided crews, maintenance and insurance pursuant to aircraft, crew, maintenance and insurance contracts ("ACMI contracts"). Under these ACMI contracts, the airlines paid an hourly rate for the use of Atlas Air's planes and services and guaranteed to utilize them a specified minimum number of hours each month. (Id. ¶ 30.)

In April 2000, Atlas began to lose clients because many airlines discovered that it was more cost effective to purchase and maintain their own fleet of cargo planes. (Id. ¶ 32.) Around this time, management represented to analysts that it would focus on controlling its crew and maintenance expenses to counteract the reduction in

---

1. Plaintiffs also named as defendant Atlas Air Worldwide Holdings, Inc. ("Atlas Air" or "Atlas" or the "company"). Atlas Air filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code on January 30, 2004. As a result, the action is stayed with respect to Atlas. We will still consider Atlas Air's submissions, however, because the other parties incorporated its arguments by reference.

2. All references herein to the Complaint are to the Second Consolidated Amended Class Action Complaint.

3. On a motion to dismiss, we accept the allegations in plaintiffs' Complaint as true.

demand. Analysts concluded that because 40% of the company's operating expenses could be attributed to crew and maintenance costs, Atlas Air could significantly improve earnings per share by controlling those expenses.

On January 25, 2001, Atlas Air suffered a severe setback when Chowdry died in a plane crash in Colorado. (*Id.* ¶ 33.) After the death of Chowdry, who by all accounts was a very "hands on" Chief Executive Officer ("CEO") and a "customer relationship builder," Atlas Air lost significant contracts. According to a former employee responsible for purchasing and contracts, business declined by approximately 20% in the months following Chowdry's death. (*Id.* ¶ 34.) Atlas Air experienced more significant setbacks during the industrywide decline caused by the attacks that occurred on September 11, 2001. Despite Atlas Air's troubles during 2000 and 2001, the company reported record earnings until the Summer of 2001.

## II. *The Allegedly False or Misleading Statements*

On April 18, 2000, the beginning of the proposed class period, defendant Shuyler, who was serving as the company's Executive Vice President at the time, (*id.* ¶ 18(a)), announced in a press release record earnings for the first quarter of 2000 with other positive news and stated "these achievements continue to reflect the ongoing strength of the international freight market and the unique nature of Atlas' business model." (*Id.* ¶ 55.) In May 2000, Atlas Air filed with the SEC a Form 10–Q that reported its financial results for the quarter. (*Id.* ¶ 57.) Atlas reported net income of $12 million, maintenance expense of $33.6 million, net accounts receivable of $100.2 million and net property and equipment of $1.6 billion. The Form 10–Q was signed by defendant Gadek, the company's acting Chief Financial Officer ("CFO") at the time.[4] (*Id.* ¶¶ 18(c), 57.)

In May 2000, the company announced a public offering of common stock pursuant to a previously-filed shelf registration (the "May 2000 Offering"). (*Id.* ¶ 59.) The company sold approximately three million primary shares in the May 2000 Offering for proceeds of approximately $90 million. (*Id.* ¶ 62.) Shuyler sold 100,000 secondary shares in the May 2000 Offering for proceeds of $3.175 million. The September Prospectus Supplement confirming the terms of the May 2000 Offering incorporated the company's Form 10–Q for the first quarter of 2000. (*Id.* ¶ 63.) Morgan Stanley served as lead underwriter for the May 2000 Offering. (*Id.* ¶ 59.)

On July 25, 2000, Atlas Air issued another press release announcing record earnings for the second quarter of 2000. (*Id.* ¶ 65.) Shuyler stated:

[O]ur ongoing cost-efficiency programs continued to yield favorable results.... Additionally, we are pleased to see Atlas' consistently strong financial record further recognized by the financial marketplace during the quarter. Not only did we successfully issue 3.5 million shares of common stock in the second quarter, but we were selected for inclusion in the S & P MidCap 400 Index. We believe these accomplishments are real testaments to the strength of the

---

4. The company included the following statement each time it issued a Form 10–Q containing unaudited financial statements: "In the opinion of management, the accompanying unaudited consolidated financial statements contain all adjustments (consisting only of normal recurring items) necessary to present fairly the financial position [of the company] ... and the results of operations and cash flows for the periods presented." (*Id.* ¶¶ 57, 67, 72, 82, 86, 89.)

business model we have created at Atlas.

(*Id.* ¶ 65.) In August 2000, Atlas Filed a Form 10–Q that reported the company's financial results for the second quarter of 2000. The company reported net income of $19 million, maintenance expense of $34.7 million, net accounts receivable of $135.4 million and net property of $1.6 billion. (*Id.* ¶¶ 66–67.) Defendant Weinroth, who was Atlas Air's acting CFO at the time, (*id.* ¶ 18(f)), signed the Form 10–Q. (*Id.* ¶ 67.)

On September 18, 2000, Atlas filed the September Prospectus Supplement relating to the September Secondary Offering. The September Prospectus Supplement incorporated the company's Forms 10–Q for the first and second quarters of 2000. (*Id.* ¶ 69.) Shuyler and Rowe, who was a director at the time, signed the Registration Statement for this offering. (*Id.* ¶ 186.) Shuyler sold 100,000 shares for proceeds of $4.35 million in the September Secondary Offering. (*Id.* ¶ 69.) Chowdry sold 1.4 million shares for proceeds in excess of $60 million. No other Atlas executives participated in the September Secondary Offering and the company did not realize any proceeds from the offering. Morgan Stanley served as the lead underwriter.

On October 24, 2000, Atlas Air announced record earnings for the third quarter of 2000. (*Id.* ¶ 71.) Shuyler stated in the press release detailing the third quarter results that Atlas' "cost efficiency and debt reduction programs continued to bear fruit." (*Id.*) In November 2000, Atlas filed a Form 10–Q, which was signed by Weinroth, reporting its third quarter financial results. The company reported net income of $23.1 million, maintenance expense of $37.8 million, net accounts receivable of $127.7 million and net property of $1.5 billion. (*Id.* ¶ 72.)

On January 26, 2001, Atlas Air issued a press release announcing earnings for the fourth quarter 2000 and fiscal year 2000 that beat Wall Street estimates. (*Id.* ¶¶ 74, 77.) Analysts attributed the company's ability to increase its earnings in the face of lower than expected demand to "good cost controls and excellent cash flow management." (*Id.* ¶¶ 76–77.) Atlas filed a Form 10–K for the fiscal year 2000 that was signed by Shuyler, Weinroth, Matheny, who was serving as President and Chief Operating Officer ("COO") at the time, and Rowe, who became Chairman of the Board of Directors in January 2001. (*Id.* ¶ 79.) The company reported net income for the year of $85.3 million, maintenance expense of $148 million, net accounts receivable of $117 million, and net property of $1.3 billion. Atlas also reported that its allowance for bad debt was $9.2 million and that it had spare parts and inventory of $11.4 million. (*Id.* ¶ 79.)

On April 24, 2001, Atlas Air announced record earnings for the first quarter of 2001. (*Id.* ¶ 81.) Shuyler stated: "Our favorable first quarter financial performance was achieved in a very difficult economic environment.... Our continued focus on expenses helped boost our pre-tax and net income margins in a low growth period." (*Id.*) In May 2001, Atlas Air filed a Form 10–Q signed by Weinroth that set forth its financial results for the first quarter of 2001. (*Id.* ¶ 82.) The company reported net income of $14.4 million, maintenance expense of $29.4 million, net accounts receivable of $125.1 million and net property of $1.4 billion.

In June 2001, analysts reported that approximately thirty-seven of Atlas Air's planes were idle due to the company's inability to enter into new ACMI contracts. (*Id.* ¶ 84.) The analysts speculated at this time that Atlas Air's "blue chip" customers were purchasing only the mini-

mum number of hours required by their ACMI contracts. (*Id.*) As a result, the analysts reduced earnings estimates from $2.34 a share to $1 a share. (*Id.*) On July 31, 2001, Atlas announced its second quarter financial results for 2001. (*Id.* ¶ 85.) Earnings were considerably lower than they had been in previous quarters. Shuyler explained:

> Atlas Air's second quarter financial performance, while consistent with our expectations, reflects the very difficult air freight environment the industry currently faces. Nevertheless, Atlas was able to show a small profit, despite the sharp decline in demand from existing long-term customers which has resulted in several under-utilized or idle aircraft.

(*Id.*) In August 2001, Atlas filed a Form 10–Q signed by Carty, the company's CFO at the time, that set forth the company's financial statements pertaining to the second quarter of 2001. The company reported net income of $0.3 million, maintenance expense of $32.2 million, net accounts receivable of $102.6 million and net property of $1.4 billion.

On November 1, 2001, Atlas announced that it had suffered a loss of $4.2 million during the third quarter of 2001 and stated that reduced demand and the effects of the attacks on September 11, 2001, were to blame. (*Id.* ¶ 88.) Shuyler stated: "While Atlas had previously acted to reduce our costs and capital spending, the benefit of those actions will not begin to be realized until the fourth quarter.... Atlas continues to maintain a strong financial condition, as evidenced by our cash and investment balances of $359 million." (*Id.*) Shortly thereafter, the company filed a Form 10–Q signed by Carty that set forth the company's financial results for the third quarter of 2001. In addition to the loss, the company reported maintenance expense of $28.5 million, net accounts re-

ceivable of $128.5 million and net property of $1.4 billion.

In January 2002, Atlas announced its results for the fourth quarter of 2001 and the fiscal year 2001. (*Id.* ¶ 91.) For the year, Atlas posted a net loss of $62.9 million. In April 2002, Atlas filed a Form 10–K signed by Carty, Shuyler, Matheny and Rowe for the fiscal year 2001. In addition to the loss, the company reported maintenance expense of $139.1 million, net property of $22.5 million, and an allowance for bad debt of $22.5 million.

### III. *Atlas Announces the Re–Audit of its 2000 and 2001 Financial Statements*

On October 16, 2002, Atlas Air announced that it was initiating a re-audit of its financial results for fiscal years 2000 and 2001 "based on a determination by the company that adjustments must be made in certain areas, which will require a restatement of certain prior financial reports." (*Id.* ¶ 94.) Shuyler explained:

> In April, we appointed Ernst & Young to replace Arthur Anderson as our independent auditor. Since that time, we have been conducting a systematic review of our financial records and accounting policies. We have now determined that adjustments will be required in the areas of inventory obsolescence, maintenance expense, and allowance for bad debt, which will necessitate the restatement of certain prior financial reports. As a result, we will undertake re-audit of the prior two fiscal years.

(*Id.*) Shuyler estimated that the restatement "would reduce after-tax income by roughly $65 million." (*Id.*) The press release stated that "until the re-audit is completed, the company cautions that its historical financial statements should not be relied upon." (*Id.* ¶ 7.) On the day of this announcement, the price of Atlas Air's

common stock fell 79 cents, or 30%, to $1.89 a share.[5] (*Id.* ¶ 95.) Subsequent to this announcement, the SEC notified Atlas Air that it had begun an informal investigation of the company. (*Id.* ¶ 96.) The SEC has since formalized its investigation. (*Id.* ¶ 101.)

In November 2002, Atlas announced that it was unable to file a Form 10–Q for the third quarter of 2002 until the re-audit of 2000 and 2001 was completed. (*Id.* ¶ 99.) In an April 2003 press release, Atlas Air announced that it was unable to file its Form 10–K for the fiscal year 2002 "due primarily to difficulties encountered in obtaining the necessary historical records and data to enable the Company's accountants, Ernst & Young, to re-audit 2000 and 2001 results, which were previously audited by Arthur Anderson." (*Id.* ¶ 105.)

In September 2003, the company disclosed that the re-audit revealed that its reported financial results would need to be restated by approximately $363.8 million, a figure that was much larger than Shuyler initially had estimated. (*Id.* ¶ 107.) The net effect of Atlas Air's restatement was to reduce retained earnings from $185 million to an accumulated deficit of $178 million. (*Id.*) The company also announced that it was unlikely that Ernst & Young would be able to complete the re-audit because of "the Company's inability to locate certain financial records." This inability to locate records made it "impossible to determine the period or periods to which certain adjustment relate[d] . . . [or] issue restated consolidated financial statements for the years ended December 21, 2001 and 2000 or any prior period." (Pls. Mem. Opp. Mot. Dismiss, Ex. 1; Complt. ¶ 107.) The company also announced its intention to file a pre-negotiated Chapter 11 bankruptcy petition. (Complt. ¶ 107.) Atlas Air's failure to file SEC documents resulted in the stock being delisted by the New York Stock Exchange and put the company in default on several of its debt obligations. Atlas filed a Chapter 11 bankruptcy petition in January 2004.

Several lawsuits alleging violations of federal securities laws followed the company's negative announcements. This Court previously consolidated several of these actions and named Messner & Smith lead plaintiff. *See Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 256 (S.D.N.Y.2003) (Conner, J.). Morgan Stanley and each of the individual defendants move to dismiss the Complaint for failure to state a claim. Morgan Stanley also moves to strike Mahoney's claims because it contends that Mahoney filed a false certification and was added as a plaintiff without leave of the Court.

## DISCUSSION

### I. *Governing Standard*

On a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999); *Faulkner v. Verizon Communications, Inc.*, 156 F.Supp.2d 384, 390 (S.D.N.Y.2001) (Conner, J.). On such a motion, the issue is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94

---

**5.** On April 18, 2000, the start of the proposed class period, Atlas shares traded at $28.25 a share. (Walker Aff., Ex. A.) On October 15, 2002, the day before Atlas announced the reaudit, Atlas shares had declined to $2.59. (Complt. ¶ 95.)

S.Ct. 1683. A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States*, 82 F.3d 23, 26 (2d Cir.1996) (quoting *Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed.1997); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 (2d Cir.1995). Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, are insufficient as a matter of law. *See Martin v. New York State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir.1978). In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference, *see* FED. R. CIV. P. 10(c); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir.1996), and documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46–48 (2d Cir. 1991).

## II. Plaintiffs' Exchange Act Claims

### A. Plaintiffs' Prima Facie Case Under § 10(b) and Rule 10b–5

Plaintiffs assert claims against the individual defendants under § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.[6] Plaintiffs allege that Atlas inflated its reported earnings by improperly accounting for obsolete inventory, maintenance expenses, bad debt and impairment to its long lived assets and that the issuance of the company's false financial results can be attributed to each individual defendant. To state a prima facie case for securities fraud under these provisions a plaintiff must show that " 'in connection with the purchase or sale of securities' " the defendant: (1) made a false representation of material fact or omitted to disclose material information that the defendant had a duty to disclose; (2) acted with scienter; and (3) " 'that plaintiff's reliance on defendant's action caused [plaintiff] injury.' " *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87,

**6.** Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

95 (2d Cir.2001) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999)) (alterations in original).

■ Securities fraud actions are subject to the pleading requirements of FED. R. CIV. P. 9(b) which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy this requirement, "a complaint 'must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995)). A plaintiff who alleges securities fraud under § 10(b) and Rule 10b–5 must also satisfy the heightened pleading standards of the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000). To plead a material misrepresentation or omission under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

### 1. *Whether Plaintiffs Have Adequately Alleged That Materially False or Misleading Statements Can be Attributed to Each Individual Defendant*

Plaintiffs allege that during the class period, Atlas Air issued false financial statements that were incorporated into the company's Forms 10–Q filed with the SEC each quarter during the class period. Plaintiffs claim that Atlas artificially inflated its financial results by failing to take a charge to income for obsolete inventory, bad debt and impairment to its long-lived assets, and by improperly capitalizing its maintenance expenses. (Complt. ¶¶ 36, 42, 46, 47.)

Plaintiffs offer, *inter alia*, the following allegations to demonstrate that the financial statements at issue were false when made: In October 2002, Atlas announced that it was initiating a re-audit of its 2000 and 2001 financial statements. (*Id.* ¶ 94.) The company explained that it expected the re-audit to reveal that adjustments to these financial statements were necessary in the areas of obsolete inventory, bad debt, impairment to long-lived assets and maintenance expenses. (*Id.*) In September 2003, the company announced that the net effect of the restatement was $363.8 million. (*Id.* ¶ 107.) The company also revealed that its auditors would be unable to complete the re-audit or issue re-audited financials for 2000 and 2001 "due to the Company's inability to locate certain financial records from those periods." (*Id.*) The company's inability to locate records also precluded a determination by the auditors of what specific period or quarters the restatement applied. (Pls.Mem.Opp.Mot.Dismiss, Ex. 1.)

■ Pursuant to Generally Accepted Accounting Principles ("GAAP"), previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued. (Complt. ¶ 145 (citing Accounting Principles Board ("APB") Opinion No. 20, *Accounting Changes*, ¶¶ 18, 27, 34–38).) Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made. *See In re Cylink Sec. Litig.*, 178 F.Supp.2d 1077, 1084 (N.D.Cal.2001) ("the mere fact that . . . statements were

restated at all" is sufficient to establish falsity at the pleading stage); *see also* APB Opinion No. 20 ¶¶ 13, 36–37.

▪ Morgan Stanley and various individual defendants argue that plaintiffs have failed to plead with particularity facts indicating that the company's financials for the first and second quarters of 2000 were false because plaintiffs have not shown that the restatement applied to those quarters. (*See, e.g.,* Morgan Stanley Mem. Supp. Mot. Dismiss at 10–11; Gadek Mem. Supp. Mot. Dismiss at 6–9.) These arguments ignore the fact that the company unambiguously stated that its financial statements pertaining to 2000 and 2001 were inaccurate. (Complt. ¶ 7.) Indeed, the company warned investors that the company's "historical financial statements [pertaining to 2000 and 2001] should not be relied upon." (*Id.*) The only reason that adjustments were never ultimately made on a quarterly basis was the company's inability to locate the supporting documentation that was necessary to do so. (*Id.* ¶ 107.) Neither the PSLRA nor Rule 9(b) requires a plaintiff to reconstruct a company's financial affairs in greater detail than the corporation's own auditors were able to achieve. The fact that Atlas announced the need to significantly adjust its reported financials for 2000 is sufficient to indicate that the company's reported financials for the first and second quarter of that year were materially false. This is especially true where, as here, there is no indication that the anticipated adjustment would relate only to specific quarters. If the company believed that its earnings were reported correctly during the first and second quarter of 2000, Atlas could and presumably would have announced that the restatement applied only to the third and fourth quarters of 2000. However, Shuyler announced that the accounting irregularities "necessitate[d] the restate-ment of *certain prior financial reports*" and that the company would "undertake re-audit of the prior two fiscal years." (Complt. ¶ 94 (emphasis added).) Nothing in these statements suggests that the first and second quarters of 2000 were somehow exempt from the need for ultimate restatement. Accordingly, we conclude that plaintiffs have adequately alleged that the restatement applied to the financial results reported for each quarter during the class period and that those financial statements contained statements that were materially false when made.

Plaintiffs have attributed statements to each individual defendant by citing various SEC documents signed by the individual defendants that recited the company's false financial results. *See In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 767 (S.D.N.Y.2001) (holding that false financial statements recited in a document filed with the SEC are attributable to the corporate officers that are signatories to that document); *see also Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1061 (9th Cir.2000) (same). Statements made by Shuyler in press releases were also specifically attributed to him. Accordingly, plaintiffs have identified the speaker of each false or misleading statement and specified "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" with the particularity required by the PSLRA and Rule 9(b).

### 2. *Scienter*

▪ The PSLRA further requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2). The requisite state of mind under § 10(b) and Rule 10b–5 is scienter. *Suez Equity Investors,* 250 F.3d at 95. A plaintiff may

establish a strong inference of scienter by pleading facts: (1) that demonstrate the defendants had both the motive and opportunity to commit fraud; or (2) that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000). Motive and opportunity are established if the plaintiff alleges " 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged' " and that the defendant had the means necessary to profit from the alleged fraud. *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). Typically, the pleading of motive and opportunity is sufficient when a plaintiff alleges that corporate insiders made materially misleading statements while selling large amounts of stock at artificially high prices. *See Novak*, 216 F.3d at 308.

■ A plaintiff can also establish a strong inference of scienter by pleading facts that tend to show the defendant acted recklessly. The Second Circuit has noted that

> securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

*Id.*

■ The Second Circuit has noted that a plaintiff is not required plead scienter with "great specificity." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 169 (2d Cir. 2000); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir.2001) ("[W]e do not require the pleading of detailed evidentiary matter in securities litigation."). Accordingly, "a plaintiff need not plead dates, times and places with absolute precision," *Int'l Motor Sports Group, Inc. v. Gordon*, No. 98 Civ. 5611, 1999 WL 619633, at *3 (S.D.N.Y. Aug.16, 1999), or precisely quantify the amount by which financial statements were overstated. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 81 (1st Cir.2002). When a plaintiff has pled facts that indicate the defendant's financial statements were false, the plaintiff " 'must supply some factual basis for the allegation that the defendants' " knew or should have known that the statements were false " 'at some point during the time period alleged.' " *Rothman*, 220 F.3d at 91 (quoting *Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769 (S.D.N.Y.1981)); *see also Scholastic*, 252 F.3d at 77.

■ In the present case, plaintiffs attempt to establish a strong inference of scienter by pleading facts that tend to show that the individual defendants acted recklessly when they participated in the issuance of materially false or misleading financial statements. They contend that the magnitude of the adjustments that the company was forced to make to its reported financial results is some evidence of scienter. Plaintiffs further argue that the factual allegations in the Complaint are sufficient when combined with the inference created by the restatement because they tend to show that the individual defendants ignored red flags relating to the core operations of the company that should have alerted them to the fact that the company's financial statements were false. We conclude that plaintiffs have pled with particularity facts sufficient to establish a strong inference of scienter with respect to each of the individual defendants with the exception of Rowe.

### a. The Magnitude of the Restatement

■ When a company is forced to restate its previously issued financial state-

ments, the mere fact that the company had to make a large correction is some evidence of scienter. *See Scholastic*, 252 F.3d at 77 (holding that a large write down supports a finding of recklessness); *Rothman*, 220 F.3d at 92 (same); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F.Supp.2d 576, 625 n. 55 (S.D.Tex.2003) (a plaintiff's allegation that the company was forced to significantly restate its earnings supports the conclusion that the defendant acted with scienter); *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125, 2002 WL 31191741, at *6, 2002 U.S. Dist. LEXIS 18555, at *18 (S.D.N.Y. Sept. 30, 2002) ("[T]he magnitude of the adjustments raises questions about defendants' credibility, makes the press statements increasingly suspect, and by doing such, further supports a strong inference of scienter.").

In the present case, Atlas was forced to restate its reported financials. The necessary adjustments related to the reported impairment to Atlas Air's fleet, its capitalization of maintenance expenses and its allowance for bad debt and obsolete inventory. The effect of the restatement was dramatic for a company of Atlas Air's size: Atlas was transformed from a company with retained earnings of approximately $185 million to a company with an accumulated deficit of approximately $178 million. Accordingly, the size and nature of the restatement suggests that this was no mere error caused by the improper application of hyper-technical accounting rules—it indicates that there were systemic accounting abuses within Atlas that re-

sulted in a serious public misrepresentation of the company's financial condition.[7]

### b. *Core Operations*

██ When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made. Indeed, if facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them. Accordingly, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989). In *Cosmas*, the plaintiff alleged that the individual defendants, who were directors of a company that provided, *inter alia*, projection services to institutions, stated that its market in the People's Republic of China was an important source of revenue for the company. These statements were made at the same time that China was imposing import restrictions that would significantly affect the company's sales to that country. *Id.* at 10. The company was ultimately forced to write-

---

7. The fact that the company was unable to locate the records necessary to complete the re-audit of fiscal years 2000 and 2001 also supports an inference of scienter. Section 13(b)(2) of the Exchange Act requires publicly traded corporations to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). Although there is no private right of action under this provision, *see Eisenberger v. Spectex Indus., Inc.*, 644 F.Supp. 48, 50 (E.D.N.Y. 1986), we conclude that where no innocent explanation for the loss of records is alleged, pleading a § 13(b)(2) violation supports an inference that false financial statements were issued with scienter.

down inventory because its anticipated sales to China had been curtailed as a result of the restrictions. *Id.* at 11. The court imputed knowledge of the import restrictions on the company's directors because "the restrictions apparently eliminated a potentially significant source of income for the company." *Id.* Accordingly, because the individual defendants were alleged to have made positive statements regarding their sales to China contemporaneously with the enactment of the import restrictions, the plaintiff had adequately pled facts giving rise to a strong inference of scienter.

■■■ Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued. In *In re Aetna Inc. Sec. Litig.*, 34 F.Supp.2d 935, 953 (E.D.Pa.1999), the defendant corporation, Aetna, acquired an insurance company for $8.9 billion. *Id.* Aetna announced that the integration of its new company was "seamless and successful." *Id.* at 948. Statements regarding the integration of the new company and the issuance of allegedly false financial statements were attributed to certain individual defendants who were high-level officers of the company. *Id.* at 949 n. 7. The plaintiff also pled facts that indicated that there were "widespread integration problems at Aetna" that should have alerted high-level officers within the company to the fact that the company's financial statements and optimistic comments were false or misleading. *Id.* at 953. The court held that by virtue of their positions with Aetna and the importance of the acquisition to the company, the individual defendants knew or should have known of the integration problems and therefore the company's financial statements were issued by the individual defendants with the requisite state of mind. *Id.; see also Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1326 (E.D.Wash.1998) ("[F]acts critical to a business' core operations or an important transaction are generally so apparent that their knowledge may be attributed to the company and its key officers.").

Shuyler argues that knowledge of a company's accounting irregularities cannot be imputed to a corporation's officers or directors without allegations that demonstrate that each individual company official knew of the irregularities because accounting practices are not sufficiently critical to a company to be considered a matter concerning the company's core operations. Shuyler's reliance on *In re Federated Dep't Stores, Inc. Sec. Litig.*, No. 00 Civ. 6362, 2004 WL 444559, at *5 (S.D.N.Y. Mar.11, 2004), in support of that position is misplaced. In *Federated*, the defendants, officers and directors of Federated, acquired a catalogue retail company called Fingerhut. *Id.* at *1. A year after the acquisition, Federated voiced concerns as to whether Fingerhut had adequate reserves for uncollectible net accounts receivable. Federated's stock fell 29% on this news. *Id.* at *2. The court held that knowledge of the accounting problems within Fingerhut could not be imputed to the officers and directors of Federated because Fingerhut represented only 10% of Federated's operations and thus was not essential to Federated's survival. *Id.* at *5. *Federated* does not stand for the proposition that corporate officers cannot be charged with knowledge of the corporation's accounting practices absent direct evidence of such knowledge. It merely holds that a corporation's officers will not be charged with knowledge of a small subsidiary's accounting problems without

some further basis for imputing such knowledge.[8]

In the present case, the individual defendants, with the exception of Rowe, were all high-level corporate officers during the class period who signed SEC filings containing the financial statements that plaintiffs have adequately alleged were materially false or misleading. As signatories to the SEC filings that contained the company's financials, each individual defendant who served as a high-level officer had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations. *See Howard,* 228 F.3d at 1062 ("Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements."). The individual defendants were not entitled to make statements concerning the company's financial statements and ignore reasonably available data that would have indicated that those statements were materially false or misleading.

Atlas ultimately restated its reported financial results by $281.4 million because of its failure to timely recognize impairment of the value of its planes. Such an impairment charge should have been taken prior to the announcement of the restatement because when the company's financial results were issued, the carrying value of the planes substantially exceeded their market value. (Complt. ¶ 47.) Plaintiffs allege that from the beginning of the class period

it either was apparent, or should have been apparent, that the value of the company's fleet was impaired. They offer a post-class-period statement made by the company in a trade publication wherein the company admitted that in 2000 it had acquired certain planes immediately prior to a collapse in the market and thus was "paying far more than what the aircraft were worth." (Complt. ¶ 47.) *See Rothman,* 220 F.3d at 92 (statements made by the corporation after the class period may be utilized by the plaintiff for pleading purposes where the corporation's statement refers to facts as they existed during the class period). Plaintiffs have also pled facts that indicate that by the spring of 2000, the beginning of the class period, Atlas began to lose customers because they discovered it was more cost effective to acquire their own cargo planes. (*Id.* ¶ 32.) Finally, plaintiffs allege that in June 2001, the company indicated that a significant number of planes were idle due to lack of demand. (*Id.* ¶ 84.) Acquiring and hiring out cargo planes pursuant to ACMI contracts are the activities that constitute the core operations of Atlas Air. Knowledge of market conditions that substantially affect these core operations and the financial reporting of them may be imputed to key officers within the company. Accordingly, plaintiffs' allegations are sufficient to demonstrate that the high-level company officers in the company that were signatories to the company's SEC filings containing its financial statements knew or should have known the planes were losing substantial value throughout

---

**8.** *Abrams v. Baker Hughes Inc.,* 292 F.3d 424 (5th Cir.2002), a case cited by Gadek, is similarly distinguishable. In *Baker* the court held that knowledge of a division's accounting troubles, which resulted in a $32 million restatement, could not be imputed to the executives of the parent company. *Id.* at 432. The division responsible for the restatement in

*Baker* was responsible for only 20% of the parent corporation's business. *Id.* at 428. Moreover, the case can be distinguished because the magnitude of the restatement in the present case is much larger than the one in *Baker* and thus gives rise to an inference of scienter.

the class period and that, as a result of the company's failure to recognize the impairment of that value, Atlas Air's financial statements were materially false.

### c. *Statements of Confidential Witnesses*

Plaintiffs have also pled statements from confidential sources that tend to show that it was apparent, or should have been apparent, to high-level company officers responsible for issuing Atlas Air's financial results that there were fundamental problems with the company's accounting for obsolete inventory, bad debt and maintenance expenses.

Atlas Air ultimately had to restate its reported financial results by approximately $34.4 million because of its failure timely to write down its obsolete inventory. According to Confidential Witness ("CW") 6, a "former employee responsible for materials coordination during the class period," Atlas had a warehouse for "surplus inventory in quarantine" located in Florida that contained "thousands" of obsolete parts. (Complt. ¶ 36.) CW 8, another former Atlas employee responsible for materials coordination, reported that in the early spring of 2001, an inventory was taken of the contents of this warehouse at the direction of senior management and Shuyler was given the results of that inventory. (*Id.* ¶ 39.) According to plaintiffs, CW 8 indicated that "[t]he inventory review identified numerous obsolete parts that the company should have written off, yet, even after the review, the Company continued to carry the obsolete parts on its books at overstated values." (*Id.*) CW 8 also stated that during the class period Atlas performed an engine upgrade on some of its planes but failed to write off the parts for the old engines that were crated and placed in the warehouse. (*Id.* ¶ 37.) CW 8 stated that the decision to upgrade was a high-level management decision. (*Id.*)

Plaintiffs further allege that the financial statements attributed to the individual defendants were issued recklessly because it was well known within the company that Atlas Air's internal controls were woefully insufficient with respect to tracking inventory. Plaintiffs offer several statements from confidential witnesses within the company that indicate that Atlas lacked adequate controls to account for obsolete inventory.[9] (*Id.* ¶ 49.)

Atlas was ultimately forced to restate its reported financial results by $17.7 million because of its failure timely to expense uncollectible net accounts receivable. CW 11, a former Atlas employee who held various positions in the finance department, overheard Robert Davis, the manager of revenue accounting, state in early 2002 that the company had failed to write down debts that should have been written off. (*Id.* ¶ 45.) CW 10, a former loadmaster, stated that in early 2000 Atlas began have trouble collecting payments owed to it by Aerofloral, one of the company's largest customers. According to CW 10, Atlas refused to lease planes to Aerofloral in the future without cash payment in advance. (*Id.* ¶ 43.) CW 7, a former load supervisor for an Atlas subsidiary, stated that Atlas continued to issue credit to Staff Air de-

---

9. The individual defendants argue that we must dismiss because plaintiff's allegations concerning lack of accounting controls within the company undermine any accusation that the individual defendants should have known that the company's financial statements were false. We disagree. Although evidence of lack of internal controls may support the inference that the individual defendants acted negligently, when viewed in the light most favorable to the plaintiff, the allegations concerning deficient internal controls bolsters the other factual allegations in the Complaint that tend to show that the individual defendants recklessly issued the company's financial statements.

spite the fact that Staff Air owed Atlas $2 million and was widely known in the industry to be insolvent. (*Id.* ¶ 44.) Plaintiffs also allege that the individual defendants were reckless when they issued the false financial statements because the "net accounts receivable department was plagued by serious internal control deficiencies" and offers the statements of a former internal auditor employed by Atlas and a former "accounts payable supervisor" that tend to support this allegation. (*Id.* ¶¶ 52–53.)

Atlas ultimately restated its reported financial results by $115.4 million because it had improperly capitalized maintenance expenses during that period. According to plaintiffs, CW 12, a "former internal auditor," stated that Atlas improperly capitalized its maintenance expenses and that the company's records relating to maintenance expenses were "messy" and "not done correctly." (*Id.* ¶ 46.) The company also admitted that Ernst & Young would be unable to complete the re-audit because "due to incompatible computer systems, the Company could not piece together its maintenance expenses for its fleet." (*Id.* ¶ 54.)

The individual defendants argue that we should disregard plaintiffs' allegations based on the statements of these confidential witnesses because plaintiffs failed to plead: "(a) any employment title; (b) any detailed job description and responsibilities; or (c) any access the source had to specific company records or other informa-

tion corroborating the facts alleged." (Atlas Mem. Supp. Mot. Dismiss at 21–22.) The individual defendants further argue that these allegations are insufficient because it is not evident from the description of plaintiffs' sources that the confidential witnesses had access to the specific facts alleged. (*Id.*)

■■■ The Second Circuit has held that a plaintiff may rely on confidential sources to plead facts giving rise to a strong inference of scienter so long as the confidential sources are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. We conclude that plaintiffs' sources are sufficiently identified because it is probable that former employees in their positions would have the knowledge they claim to possess.[10] Plaintiffs are not required to plead exact job titles, describe the sources' responsibilities and duties in detail or allege access to specific company documents. Viewing the statements of plaintiffs' confidential sources as a whole, it is apparent that during the class period it was well known within the company that Atlas was experiencing difficulties in the area of inventory control and accounts receivable and that Atlas lacked internal controls to adequately track inventory, maintenance expenses and net accounts receivable.

---

**10.** CW 8's statement, wherein the former employee responsible for materials coordination indicated that certain inventory was not written off, presents a closer question on this issue. We would prefer a more detailed description of CW 8's basis of knowledge of the company's accounting practices with respect to obsolete inventory. However, the fact that plaintiffs have already adequately alleged that obsolete inventory was not written down in a timely manner renders these allegations less integral to plaintiffs' claims and thus a less detailed description is required. *Novak*, 216 F.3d at 314 (noting that a plaintiff is not required to describe a confidential source at all if there are independent factual allegations to corroborate the source's statement). Furthermore, an employee responsible for materials coordination at Atlas is likely to be familiar with the inventory that should be and that which has been deemed obsolete by the company for accounting purposes.

#### d. Plaintiffs' Allegations Amount to More Than "Fraud By Hindsight"

Contrary to the individual defendants' contention, plaintiffs are not merely attempting to plead "fraud by hindsight." The term "fraud by hindsight" generally refers to the pleading device wherein a plaintiff (1) alleges that bad news that was ultimately disclosed by the company should have been announced sooner, *see Acito*, 47 F.3d at 53 ("Mere allegations that statements made in one report should have been made in earlier reports do not make out a claim for securities fraud."); or (2) alleges that the defendant made optimistic statements in the past and contends that those statements were fraudulent because subsequent developments proved them to be false. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.) (noting that while "greater clairvoyance" might have allowed the defendants to predict subsequent developments, "failure to make such perceptions does not constitute fraud."). In the present case, plaintiffs do not contend that Atlas took a large write-down that should have been taken sooner nor do they argue that the individual defendants made statements that were incorrect because they proved to be overly optimistic in light of subsequent events. Plaintiffs allege that Atlas had to make drastic adjustments to its reported financials for 2000 and 2001 because the company failed to take into account information that was available to it when those results were issued. *See Rothman*, 220

F.3d at 90 (distinguishing overly optimistic statements from false statements of historical fact); *Schnall v. Annuity & Life Re (Holdings), Ltd.*, 02 Civ. 2133, 2004 WL 231439, at *7, 2004 U.S. Dist. LEXIS 1601, at *22 (D.Conn. Feb. 4, 2004) ("There also can be no dispute that defendant ... had a duty to exercise a certain level of care when making financial disclosures. These were not disclosures concerning future performance. These were statements about past performance ... as to which [defendant] had knowledge or should have had knowledge.").[11]

Moreover, this case does not present the issue that was before the court in *Stevelman*. In that case, the defendant announced that it had booked revenues in violation of GAAP and would retroactively restate earnings for three quarters. 174 F.3d at 82–83. The plaintiff argued that the mere fact that the defendant restated earnings established the requisite strong inference of scienter. *Id.* at 85. The court held that the mere fact that the defendant restated earnings, without more, was not probative of conscious misbehavior or recklessness and noted that it appeared that the plaintiff was attempting to plead "fraud by hindsight." *Id.* at 85. In the present case, plaintiffs have alleged facts in addition to the restatement that demonstrate that certain individual defendants acted recklessly when they participated in the issuance of the company's false financial results. *See supra* Part II.A.2.a.-Part II.A.2.c. Accordingly, plaintiffs are not

---

**11.** The fact that plaintiffs have adequately alleged that the individual defendants made false or misleading statements also distinguishes this case from those where the court dismissed the plaintiff's claims because the allegations amounted to nothing more than corporate mismanagement. Although "poor business judgment is not actionable under" federal securities laws, a plaintiff has alleged more than mere corporate mismanagement when he has adequately alleged that the defendant made false statements concerning historical facts. *Rothman*, 220 F.3d at 90; *see also Hurley v. Fed. Deposit Ins. Corp.*, 719 F.Supp. 27, 30 (D.Mass.1989) ("The prohibition on individual shareholders bringing a 10b–5 claim based on corporate mismanagement is inapplicable where ... there are allegations of material misrepresentations or omissions.").

merely attempting to plead "fraud by hindsight" because they have alleged additional facts besides the restatement that demonstrate high-level officials within the company ignored red flags that should have alerted them to the fact that the company's reported financials were false when issued.

 Plaintiffs are not required, as Shuyler suggests (Shuyler Mem. Fur. Supp. Mot. Dismiss at 5), to plead the existence of specific internal reports to which each individual had access in order to show the individual defendants knew or should have known that their statements were false. Shuyler cites the following passage in *Novak*:

> [A]s long as the [defendant's] public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.... Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the *reports or statements* containing this information.

216 F.3d at 309 (citations omitted) (emphasis added). This passage refers to the situation wherein a plaintiff alleges that the defendant made overly optimistic statements and that internal company reports should have alerted the defendant to the falsity of his statements. When a plaintiff takes this approach, it is incumbent upon him to identify sufficiently the internal reports that would have alerted the defendant to the falsity of the statements at issue. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812 (2d Cir.1996). However, a plaintiff is not required to plead internal reports to demonstrate that contradictory facts were available to the defendants when they made certain statements in all cases where it is alleged the defendants were reckless; it is sufficient to plead statements obtained from confidential sources with pertinent knowledge so long as those sources are described adequately. *See Novak*, 216 F.3d at 314.

Shuyler also cites *Scholastic* for the proposition that a plaintiff is required to refer to specific internal reports in order to show that each individual defendant was reckless. In that case, the company and its officer represented to the public that a certain series of children's books was performing well and consumers were not returning the books at a high rate. 252 F.3d at 67. However, the plaintiff alleged that customers were returning the books at increased levels and, as a result, the company's financials were overstated. *Id.* at 73. The court held that the plaintiffs adequately pled scienter because they had referenced a variety of sources, including company reports, that indicated that the defendants knew or should have known their statements were false. *Id.* at 76–77. However, the court noted that the plaintiff alleged facts independent of the internal company reports that supported a finding of recklessness. Specifically, the plaintiff alleged that Toys R' Us informed Scholastic that the books at issue were "too scary" and that they were being returned at a very high rate. The court stated that this allegation, when combined with the size of the write-down the company ultimately took, was also sufficient to plead recklessness. *Id.* at 77. Accordingly, *Scholastic* does not require a plaintiff to reference internal company reports whenever a plaintiff endeavors to plead that an individual defendant was reckless. A plaintiff is required only to " 'supply some factual basis for the allegation that the defendants had' " concluded or should have concluded that the statements were false " 'at some point during the time period alleged.' "

*Rothman,* 220 F.3d at 91 (quoting *Posner,* 92 F.R.D. at 769).

### e. *Plaintiffs' Scienter Allegations With Respect to Each Individual Defendant*

#### (1) *Defendants Shuyler, Weinroth, Matheny & Carty*

Shuyler served as the company's Executive Vice President until January 2001 when he became the company's CEO. (Complt. ¶ 18.) He also served on Atlas Air's Board of Directors and was a company spokesperson throughout the class period. Each quarter Shuyler was quoted in company press releases making statements concerning the company's financial results, business model and ability to control costs. Shuyler was also a signatory to the company's Forms 10–K for the fiscal years 2000 and 2001. Weinroth signed the company's Forms 10–Q for the second and third quarters of 2000 and Form 10–K for fiscal year 2000 in his role as acting CFO of the company. When Weinroth was not the acting CFO, he was the Vice President of Financial Planning and Controller. (*Id.* 18(f).) Defendant Matheny served at various times during the class period as the company's President, COO and Executive Vice President. (*Id.* ¶ 18(e).) He also served on the company's Board of Directors and signed Atlas Air's Forms 10–K for fiscal years 2000 and 2001. Defendant Carty joined the company in June 28, 2001,

and served as its CFO and Senior Vice President. He signed the company's Forms 10–Q for second and third quarters of 2001 and Form 10–K for the fiscal year 2001. (*Id.* ¶ 18(c)).

Plaintiffs have pled facts that indicate that Shuyler, Weinroth, Matheny and Carty had access to information that should have alerted them to the falsity of the company's financial statements. First, the sheer size magnitude of the restatement indicates that these officers, who were responsible for the issuance of the company's financial results, knew or should have known that these statements were false when issued. Second, plaintiffs have pled that certain red flags [12] should have alerted high-level company officials that the value of Atlas Air's fleet of cargo planes was impaired and that there were problems in the areas of inventory control, accounts receivable and maintenance expenses. These allegations are sufficient for pleading purposes to demonstrate that Shuyler, Weinroth, Matheny and Carty knew, or were reckless in not knowing, that Atlas Air's financial results were false when issued and thus the requisite strong inference arises.[13]

#### (2) *Defendant Gadek*

Gadek left the company in August 2000, four months after the beginning of the proposed class period. In his role as acting CFO of the company, Gadek signed

---

12. Although Carty joined the company in June 2001, plaintiffs have sufficiently alleged that these red flags were apparent when Carty joined the company as CFO and for the remainder of the proposed class period.

13. The Complaint includes additional scienter allegations with respect to Shuyler. Plaintiffs allege that a confidential source indicated that Shuyler had first-hand knowledge of the fact that the company had failed to timely write-down obsolete inventory. Plaintiffs have also alleged that Shuyler sold 58% of his

total beneficially owned stock in the company for proceeds in excess of $7 million dollars during the class period. Because these sales occurred around the time that Shuyler was quoted in company press releases announcing the company's false financial results and making optimistic statements regarding the company's business model and ability to control costs, we conclude that these sales further reinforce plaintiffs' allegations of Shuyler's scienter.

Atlas Air's Form 10–Q for the first quarter of 2000. As discussed *supra* in Part II.A.1., plaintiffs have adequately alleged that the restatement applied to the first quarter of 2000. Accordingly, the fact that the company's financials required restatement allows an inference of scienter with respect to Gadek. Moreover, the factual allegations in the Complaint demonstrate that from the beginning of the proposed class period it should have been apparent to high-level officers that the value of the company's cargo planes was impaired, *see supra* Part II.A.2.b., and that certain customers were insolvent. (*Id.* ¶ 43). Plaintiffs also allege that Gadek acted recklessly because he participated in the issuance of financial results when Atlas Air lacked adequate internal controls for accounting for inventory, net accounts receivable and maintenance expenses. (*Id.* ¶¶ 48–54.) Although the allegations of scienter with respect to Gadek are not as strong as the allegations against some of the other individual defendants, the Complaint sufficiently details facts that indicate that Gadek either knew or should have known that the company's financial statements for the first quarter of 2000 were false when made. Thus, plaintiffs have established a strong inference of scienter with respect to Gadek.

### (3) *Defendant Rowe*

Plaintiffs have not pled facts sufficient to create a strong inference that Rowe knew or should have known that the Forms 10–K for the fiscal years 2000 and 2001 he signed while he was Chairman of Atlas Air's Board of Directors contained false financial statements because the Complaint alleges that Rowe was merely an outside director during the class period. It is less reasonable to impute knowledge of Atlas Air's accounting irregularities to Rowe since he apparently was not involved in the day-to-day operations of the company. *See Jacobs v. Coopers & Lybrand, L.L.P.,* No. 97 Civ. 3374, 1999 WL 101772, at \*16 (S.D.N.Y. Mar.1, 1999) (holding that the plaintiff failed to plead that an outside director who signed a SEC filing containing false financials acted with scienter because he was an outside director who was not involved in the day-to-day operations of the corporation). Plaintiffs have attempted to cure this defect by alleging in their Memorandum of Law that Rowe was a member of the audit committee during the class period, an allegation that Rowe does not contest. However, even if plaintiffs had alleged this fact in the Complaint, it would be insufficient to establish a strong inference of scienter unless plaintiffs could plead that the audit committee was given information that should have alerted Rowe to the fact that the company's financials were false. *See id.* at \*17 ("[J]ust because a defendant is a director and member of the company's audit committee does not lead automatically to an inference that the person acted with conscious disregard of a known risk as opposed to with gross negligence or even negligence.").

Plaintiffs have alleged only that Rowe was an outside director, albeit the Chairman of the Board of Directors since January 2001, of a company that was forced to restate its earnings significantly. Although this may be enough to suggest scienter, it does not create the requisite strong inference. Accordingly, we will dismiss plaintiffs' claim under § 10(b) and Rule 10b–5 against Rowe without prejudice and grant plaintiffs leave to replead that claim.

### 3. *Loss Causation*

█ The individual defendants argue that this action must be dismissed for plaintiffs' failure to plead loss causation. The PSLRA provides: "In any private ac-

tion arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). In order to survive a motion to dismiss for failure to plead loss causation, plaintiffs must "adequately allege a causal connection between" the misleading statements or omissions and the decline in value of the securities at issue. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.2003). Plaintiffs' allegations are sufficient if they tend to show that their loss was a foreseeable consequence of the misrepresentation. *Id.* Although the individual defendants may be able to demonstrate that an intervening event broke the chain of causation, "such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Id.*

 ■ In the present case, plaintiffs have alleged that on October 15, 2002, the date that Atlas revealed that it needed to restate its 2000 and 2001 reported financials, shares of Atlas Air declined by 30% on trading that was ten times the typical daily volume for the stock. (Complt. ¶ 95.) The stock rebounded shortly thereafter but the gains were only temporary. In the ensuing months the company announced its inability to complete its re-audit of fiscal years 2000 and 2001 and file certain documents with the SEC. The NYSE responded by delisting the company's stock and Atlas filed a Chapter 11 bankruptcy petition.[14] These allegations are sufficient to plead loss causation because plaintiffs have adequately alleged that their loss was a foreseeable consequence of the false financial statements issued by the company. Although most of the losses suffered by investors who purchased early in the pro-

posed class period were caused by the industry-wide decline in the air cargo market, plaintiffs are not required to plead that the individual defendants caused all the losses suffered by each member of the class. The individual defendants may be able to demonstrate that an intervening cause was the true reason for plaintiffs' loss, but "such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt.*, 343 F.3d at 197.

### B. *Plaintiffs' § 20(a) Claims*

 ■ Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable ... to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To state a *prima facie* case under § 20(a) "a plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)); *see also Suez Equity Investors*, 250 F.3d at 101.

 ■ "Control" under this section is defined as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." 17 C.F.R. § 240.12b–2; *see*

---

**14.** Currently, stock in Atlas Air trades for pennies a share.

*also First Jersey,* 101 F.3d at 1473. It is well settled that a plaintiff who merely alleges that the defendant was an officer or director of the corporation has not sufficiently pled "control." *See In re CINAR Corp. Sec. Litig.,* 186 F.Supp.2d 279, 309 (E.D.N.Y.2002). We have previously held that a plaintiff has adequately pled "control" when he has alleged that the defendant controlled the content of company press releases and public filings. *In re Quintel Entm't Inc. Sec. Litig.,* 72 F.Supp.2d 283, 289 (S.D.N.Y.1999) (Conner, J.). Moreover, where it is alleged that an officer or director signed an allegedly fraudulent SEC filing, courts have concluded that "control" was adequately pled. *See CINAR,* 186 F.Supp.2d at 309; *Jacobs,* 1999 WL 101772, at *17. Indeed, "[i]t does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." *Jacobs,* 1999 WL 101772, at *17.

In the present case, plaintiffs have pled a primary violation under the Exchange Act. They also adequately allege that the individual defendants had control over a primary violator because the individual defendants were all high-level officers or directors who signed allegedly fraudulent SEC filings. Culpable participation is adequately alleged with respect to all of the individual defendants except Rowe because plaintiffs have pled facts giving rise to a strong inference that they acted with scienter. Accordingly, we deny the motions of Shuyler, Weinroth, Matheny, Carty and Gadek's to dismiss the § 20(a) claims against them.

The allegations of culpable participation with respect to Rowe are deficient because plaintiffs have pled only that he was an outside director during the proposed class period and that he signed the company's Forms 10–K for the fiscal years 2000 and 2001. More is required. *See CINAR,* 186 F.Supp.2d at 309 (merely alleging that an outside director signed allegedly fraudulent SEC filings is insufficient to plead culpable participation). Accordingly, we dismiss the § 20(a) claim against Rowe and grant plaintiffs leave to replead that claim.

### III. *Securities Act Claims*

#### A. *Morgan Stanley's Motion to Strike*

In *Weinberg,* 216 F.R.D. at 256, we consolidated several actions brought under federal securities laws against Atlas Air and named Messner & Smith lead plaintiff. Prior to the issuance of the Court's Opinion and Order naming Messner & Smith lead plaintiff (the "May 2003 Opinion"), the parties entered into a Stipulation wherein they agreed that the party ultimately named lead plaintiff would have 45 days from the entry of the Opinion and Order to file a Consolidated Amended Complaint. The Stipulation was "So Ordered" by the Court on February 19, 2003, and thus became an Order of this Court (the "February 2003 Order"). Accordingly, subsequent to the May 2003 Opinion, Messner & Smith as lead plaintiff filed a Consolidated Amended Complaint (the "First Amended Complaint") that added Mahoney as the Securities Act plaintiff, presumably to ensure that it had included a named plaintiff who had standing to assert a § 11 claim. A certification signed by Mahoney in November 2002, almost a year before the First Amended Complaint was filed, was annexed to the First Amended Complaint. In this certification, Mahoney stated that he had reviewed the complaint and authorized its filing. Morgan Stanley argues that we must strike Mahoney's claims because: (1) his certification, in which he purported to review a complaint almost a year before it was filed, was obviously

false; and (2) Mahoney was added as a party without leave of the Court.

■ The PSLRA provides, "Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that ... states that the plaintiff has reviewed the complaint and authorized its filing." 15 U.S.C. § 77z–1(a)(2)(A)(i). Plaintiffs explain that the certification filed by Mahoney with the First Amended Complaint is the certification that he signed when he originally commenced a suit asserting § 11 claims against Morgan Stanley, Atlas Air and certain individual defendants. Plaintiffs argue that this certification is sufficient because the PSLRA does not require a class representative to file a new certification each time an amended complaint is filed in his case. We agree. Morgan Stanley has not cited any authority supporting its contention that a class representative must file a new certification each time his attorney makes an amendment to the complaint and we think such a requirement would be a useless burden.[15] Mahoney's certification establishes that he is familiar with the § 11 claims against Morgan Stanley and Shuyler and Rowe and that he authorized commencement of suit on those claims. Accordingly, Morgan Stanley's motion to strike for failure to file a new certification is denied.

■ It was unnecessary for lead plaintiff to name Mahoney to ensure that the Securities Act claims in the Complaint were not dismissed prior to class certification because Weinberg, a named plaintiff, has standing to bring those claims. *Weinberg*, 216 F.R.D. at 253; *see also In re*

*Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F.Supp.2d 249, 257 (S.D.N.Y.2004) (Conner, J.) ("[A] party named 'lead plaintiff' under the PSLRA need not have standing to sue on each individual claim asserted in the complaint so long as other named plaintiffs have standing to pursue the claims at issue.") (citing *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y.2002)); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 451 (S.D.Tex.2002); *In re Am. Bank Note Holographics Sec. Litig.*, 93 F.Supp.2d 424, 436 (S.D.N.Y.2000). However, when this Court issued the February 2003 Order granting lead plaintiff leave to amend in conformance with this Court's pending lead plaintiff determination, the February 2003 Order did not state that leave to amend was granted for any limited purpose or otherwise specify that the lead plaintiff could not add a new party when it filed a First Amended Complaint. Indeed, in our May 2003 Opinion we stated "subclasses or representatives may be appointed, if necessary, as the litigation proceeds." *Weinberg*, 216 F.R.D. at 254. Accordingly, we will not strike Mahoney's allegations for lead plaintiff's failure to obtain leave of the Court to add a party because we implicitly granted such leave in our February 2003 Order and May 2003 Opinion. Moreover, even if we were to strike Mahoney's allegations on this ground, lead plaintiff would still be entitled to replead the Securities Act claims and the amended claims would relate back because lead plaintiff has standing to bring those claims by virtue of the fact that a named plaintiff in this case has standing. Therefore, Morgan Stanley has not been prejudiced by lead plaintiff's fail-

---

**15.** Contrary to Morgan Stanley's assertion, *In re Eaton Vance Corp. Sec. Litig.* is not on point. 219 F.R.D. 38, 42 (D.Mass.2003). In that case, the court granted the defendant's motion to strike because the relevant class representative had failed to file any certification whatsoever.

ure to obtain express leave of the Court to add a party.

### B. *Plaintiffs' § 11 Claims*

 Plaintiffs assert claims against Morgan Stanley, Shuyler and Rowe under § 11 of the Securities Act. In order to state a claim under § 11, a plaintiff must allege that "the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading ...." 15 U.S.C. § 77k(a). A claim under this section may be brought against, *inter alia,* every person who signed the registration statement, the directors of the issuer and the underwriter of the security. 15 U.S.C. § 77k(a). The Second Circuit recently held that FED. R. CIV. P. 9(b), which provides "[i]n all averments of fraud or mistake, the circumstances regarding fraud or mistake shall be stated with particularity," applies to § 11 claims that sound in fraud. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004). Accordingly, when a § 11 claim sounds in fraud a plaintiff " 'must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Id.* (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Although the Second Circuit recognized that allegations supporting a § 11 claim that sound in fraud may also support a § 11 claim predicated on negligence or strict liability, it cited the Fifth Circuit's decision in *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.* for the proposition that courts are not

> "required to sift through allegations of fraud in search of some 'lesser included' claim of strict liability," and instead

should dismiss and permit counsel to offer an amended claim "that either pleads with the requisite particularity or drops the defective allegations and still states a claim."

*Rombach*, 355 F.3d at 176 (quoting *Lone Star*, 238 F.3d 363, 368–69 (5th Cir.2001)). Accordingly, when faced with a § 11 claim that sounds in fraud but fails to meet the requirements of Rule 9(b), a court may dismiss the claim with leave to replead a § 11 claim based on negligence or strict liability unless repleading would be futile. *Rombach*, 355 F.3d at 176; *Lone Star*, 238 F.3d at 368–69.

In *Rombach*, the plaintiffs asserted § 10(b) and Rule 10b–5 claims against the individual defendants, alleging that they made overly optimistic statements while they were officers of Family Golf Centers, Inc. ("Family Golf"). The plaintiffs alleged that these statements were false when made because the company faced a "liquidity crisis" caused by its inability to integrate certain acquisitions. 355 F.3d at 167–68. The plaintiffs also asserted § 11 claims against the individual defendants and the underwriters of a secondary public offering that occurred during the class period. The plaintiffs did not allege that the registration statement contained an affirmative misstatement. Instead, they argued that the registration statement failed to disclose that the offering was necessitated by the company's liquidity problems and that the company was experiencing integration problems. *Id.* at 175. The Second Circuit concluded that the plaintiffs' § 11 claims against the individual defendants sounded in fraud. *Id.* at 172. However, the plaintiffs' § 11 claims against the underwriters did not sound in fraud because the plaintiffs did not allege that the underwriters acted fraudulently but instead alleged that " 'each of the Underwriter Defendants owed to the purchas-

ers of the shares of [Family Golf] . . . the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus.'" *Id.* at 178 (quoting the complaint). The court affirmed dismissal of the § 10(b) and § 11 claims against the individual defendants because the plaintiffs failed to plead with particularity any actionable misstatement or omission or that the individual defendants acted with scienter. *Id.* at 174–77. The Second Circuit also affirmed dismissal of the § 11 claims against the underwriters because the registration statement contained meaningful cautionary language that triggered the "bespeaks caution" doctrine and the similar safe harbor provision of the PSLRA. *Id.* at 178.

Rule 9(b) does not apply to plaintiffs' § 11 claims against Morgan Stanley because that claim does not sound in fraud. The Complaint contains no allegations of fraudulent conduct on the part of Morgan Stanley and plaintiffs have not asserted any Exchange Act claims against the underwriter. Moreover, the Complaint contains allegations that are similar to those levied against the underwriters in *Rombach*—the plaintiffs allege that Morgan Stanley failed to conduct a reasonable investigation into the company and thus it lacked "reasonable grounds for the belief that the statements contained in the Registration Statement and September Prospectus Supplement . . . were not misleading." (Complt. ¶ 187.)

■ The plaintiffs have stated a *prima facie* case under § 11 against Morgan Stanley. The Complaint adequately alleges that the company's Forms 10–Q for the first and second quarters of 2000 were materially false when issued. *See supra* Part II.A.1. These statements were incorporated into the September Prospectus Supplement that was utilized in the September Secondary Offering and Morgan Stanley served as lead underwriter for that offering. Accordingly, plaintiffs have adequately pled that the Registration Statement contained "an untrue statement of a material fact." Morgan Stanley's motion to dismiss is therefore denied.

■ Plaintiffs have specifically alleged that the § 11 claims against Shuyler and Rowe do not sound in fraud. (Complt. ¶¶ 181–82.) While the Second Circuit held in *Rombach* that a similar effort to disavow allegations of fraud in other parts of the complaint were insufficient to avoid the operation of Rule 9(b) because district courts were not "'required to sift through allegations of fraud in search of'" a claim for strict liability or negligence, 355 F.3d at 176 (quoting *Lone Star,* 238 F.3d at 368–69), the present case is distinguishable from *Rombach* on this point. In *Rombach,* the plaintiffs claimed that the defendants omitted to disclose in the prospectus that the company faced liquidity and integration problems. *Rombach,* 355 F.3d at 175. Accordingly, the plaintiffs in *Rombach* attempted to plead that statements were false by alleging that the speakers knew of information that they had a duty to disclose or that contradicted their public statements.[16] This is analogous to the pleading device, often employed in actions brought under § 10(b) and Rule 10b–5, wherein the plaintiffs plead facts that indicate that the defendants knew or should have known that their statements were false without first establishing that the statements were false. This device is often the only method by which the plaintiffs may establish that certain optimistic forward looking statements were false when made. For example, if the plaintiffs al-

---

16. The plaintiffs' allegations in *Rombach* were insufficient because the court concluded that the defendants' disclosures in the registration statement were sufficient.

leged that the defendants issued overly optimistic sales forecasts, it would be impossible to show that the forecasts were false when made unless the plaintiffs could plead facts indicating that the speakers had access to information that contradicted those forecasts. *See In re QLT Inc. Sec. Litig.*, 312 F.Supp.2d 526, 532 (S.D.N.Y. 2004). "In this respect, if the [plaintiffs] have sufficiently pled facts to support scienter, they have also met the pleading requirements for false representation or omission." *Rothman*, 220 F.3d at 90. The application of Rule 9(b) to § 11 claims is logical when the plaintiffs employ this pleading device because the only allegations supporting falsity are the plaintiffs' allegations relating to fraudulent intent. When this is the case, the plaintiffs' claims for fraud are substantially intertwined with their § 11 claims.

In the present case, plaintiffs have alleged facts independent of their scienter allegations that indicate that the Forms 10–Q, which were incorporated into the Registration Statement, were false when issued. *See supra* Part II.A.1. Accordingly, there is no need for the Court to sift through plaintiffs' allegations in search of an actionable § 11 claim because it is clear on the face of the Complaint that plaintiffs have an actionable claim under that provision. Dismissal would only serve to require plaintiffs to replead to include allegations of scienter, an element that a plaintiff is not required to prove in order for liability to attach under § 11. Moreover, plaintiffs have alleged that Shuyler and Rowe failed to conduct a reasonable investigation and lacked "reasonable grounds for the belief that the statements contained in the Registration Statement and September Prospectus Supplement … were not misleading." (*Id.* ¶ 187) This language is similar to the language that the Second Circuit concluded was sufficient to establish that the § 11 claims against the underwriter defendants in *Rombach* did not sound in fraud. *Rombach*, 355 F.3d at 178. Therefore, we conclude that plaintiffs' § 11 claims against Shuyler and Rowe do not sound in fraud and Rule 9(b) does not apply.

■ Even if Rule 9(b) applied to plaintiffs' § 11 claims against Shuyler and Rowe, dismissal of those claims is not required. In *Lone Star*, a case cited with approval by the Second Circuit in *Rombach*, the Fifth Circuit held that where Rule 9(b) applies to a § 11 claim, dismissal is not required if the plaintiffs' failure to plead scienter is the only defect in the complaint. The Fifth Circuit suggested the following approach:

> Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated. The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated. There is a qualification. A district court need not rewrite such a deficient complaint. It may dismiss, without prejudice, placing the responsibility on counsel.

*Lone Star*, 238 F.3d at 368; *see also CINAR*, 186 F.Supp.2d at 307 (applying *Lone Star*). In the present case, plaintiffs have sufficiently pled with particularity facts demonstrating that the Registration Statement contained false statements. *See supra* Part II.A.1. Accordingly, dismissal is not required and would only serve to waste judicial resources and the parties' time because it is clear that the plaintiffs can state a claim against Rowe and Shuyler merely by: (1) removing their allegations of scienter with respect to Rowe from the Complaint; and (2) by re-alleging their scienter allegations against Shuyler. Accordingly, Shuyler and Rowe's motions to

dismiss plaintiffs' § 11 claims against them are denied.

### C. *Plaintiffs' § 15 Claims*

■ Plaintiffs assert claims against Shuyler, Weinroth, Rowe and Matheny under § 15 of the Securities Act. This provision allows a plaintiff to proceed against "[e]very person who, by or through stock ownership, agency or otherwise . . . controls any persons liable under section 11" of the Securities Act. 15 U.S.C. § 77o. Plaintiffs have adequately pled facts that indicate that Shuyler, Weinroth and Rowe were control persons at the time the September Prospectus Supplement was issued. They were all high-level officers or directors at the time of the issuance of the September Prospectus Supplement. Shuyler and Rowe were signatories to the September Prospectus Supplement and Weinroth signed the company's Form 10–Q for the second quarter of 2000. These allegations are sufficient to plead control. *See CINAR*, 186 F.Supp.2d at 309; *Jacobs*, 1999 WL 101772, at *17. Plaintiffs attempt to allege that Matheny was a control person at the time the September Prospectus Supplement was issued by virtue of the fact that he was a high-level officer of the company. This is insufficient to establish control. *See CINAR*, 186 F.Supp.2d at 309. Accordingly, the plaintiffs' § 15 claims against Matheny are dismissed without prejudice. Shuyler, Weinroth and Rowe's motions to dismiss the § 15 claims against them are denied. *See Indep. Energy Holdings*, 154 F.Supp.2d at 770 (a plaintiff is not required to plead "culpable participation" to state a claim under § 15).

### CONCLUSION

For the reasons stated herein, defendants Richard Shuyler, Douglas Carty, Stanley Gadek and Stuart Weinroth's motions to dismiss pursuant to section 21D(b)(3)(B) of the Private Securities Litigation Reform Act, and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim are denied in their entirety. Morgan Stanley & Co., Inc.'s ("Morgan Stanley") motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and motion to strike pursuant to FED. R. CIV. P. 12(f) are also denied.

Defendant Brian Rowe's motion to dismiss is granted in part and denied in part. Accordingly, plaintiffs' claims against him under § 10(b) and Rule 10b–5 of the Exchange Act are dismissed without prejudice. Rowe's motion to dismiss plaintiffs' claims against him under the Securities Act is denied.

Defendant James Matheny's motion to dismiss is granted in part and denied in part. Accordingly, plaintiffs' claims against him under § 15 of the Securities Act are dismissed without prejudice. Matheny's motion to dismiss plaintiffs' Exchange Act claims and § 11 claim is denied.

Plaintiffs may file a Third Amended Consolidated Class Action Complaint within 30 days of entry of this Order to replead the claims that have been dismissed.

SO ORDERED.